1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LASHLINER INC., a Washington corporation; TORI BELLE COSMETICS LLC, a Washington limited liability company; and LAURA HUNTER, a Washington resident, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMAND** |
| MICHELLE "SHELLEY" LABAW a/k/a MICHELLE LEONE, a New Jersey Resident; and DOES 1–8, | |
| Defendants. | |

## I.    INTRODUCTION

1.      For the past nine months, Defendant Michelle "Shelley" LaBaw, (a/k/a Michelle Leone) has waged a spite-driven campaign of disinformation aimed at harming the business and reputations of Plaintiffs Laura Hunter, Tori Belle Cosmetics LLC ("Tori Belle"), and LashLiner Inc. ("LashLiner," and together with Hunter and Tori Belle, "Plaintiffs").

2.      As LaBaw herself stated in a video livestream, she did this because "[t]his company deserves to burn to the ground." She likewise threatened to "destroy[ ] [Hunter's life] with the truth," in a September 23, 2020 post on the "Karen Cunter" Instagram profile that she has used to

COMPLAINT - 1

disparage, threaten, defame, and ridicule Plaintiffs. Karen Cunter (@touringhell), INSTAGRAM, http://instagram.com/touringhell (last visited Nov. 18, 2020) (emphasis added).

3. LaBaw indeed wreaked destruction, not with the truth, but with misleading statements, distorted narratives, and outright lies about Plaintiffs.

4. LaBaw's malicious attacks were designed to—and did—prompt key customers and business affiliates to spurn Plaintiffs and their business. She organized boycotts and invited people to file baseless complaints with industry regulators. She used lies to cast disdain and contempt upon Plaintiffs within the tightly knit social media community upon which Plaintiffs' business depends. And she personally and repeatedly spewed vitriol and lies toward Hunter, whom she labelled a "day drinker," a "dirty cunt," "a psychopath," "a narcissistic shitbag," and "a scrotum" in videos viewed by dozens of LaBaw's followers.

5. For months, Hunter has been unable to so much as open her social media feed without seeing an unrelenting—and false—assault on her character.

6. As a result, Plaintiffs have suffered significant economic damages of more than one million dollars in lost sales, wasted person hours, and contractor attrition. These losses will increase by several orders of magnitude if LaBaw's conduct continues. These sums do not even include the serious reputational harm and loss of goodwill that LaBaw has caused Tori Belle and LashLiner, nor the emotional distress she has inflicted and continues to inflict on Ms. Hunter and for which Plaintiffs are entitled to recover additional amounts.

## II.    PARTIES

7. Plaintiff Tori Belle is a Washington limited liability company with its principal place of business in Woodinville, Washington. The members of Tori Belle are Plaintiff Laura Hunter and Bob Kitzberger, a non-party, both of whom are citizens of Washington State.

8. Plaintiff LashLiner is a Washington corporation with its principal place of business in Mill Creek, Washington.

9. Plaintiff Laura Hunter is a natural person who is a citizen of Washington State.

COMPLAINT - 2

10.     Defendant Michelle "Shelley" LaBaw is a natural person who is a citizen of New Jersey. On information and belief, LaBaw owns, controls, or has the ability to control, several social media accounts used to wage the disinformation and cyber-bullying campaign at the heart of this case, including, but not limited to, the Instagram accounts @touringhell and @beyoutvindustry. Plaintiffs are informed and believe that discovery will identify additional social media accounts that LaBaw used to attack Plaintiffs.

11.     Plaintiffs do not know the true names and places of citizenship of the Defendants sued in this Complaint as Does 1 through 8 ("Doe Defendants"), and therefore sue them under fictitious names. The identities of the Doe Defendants will be readily ascertained through party discovery or via subpoenas. The Doe Defendants include, without limitation, those persons that own, control, or have the ability to control, the Instagram accounts @l_hicks7419, @themrsmeek, and @thenataliemeek; and the Facebook profiles Brooklyn Parten and Kayla Willis.

### III.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the controversy is between citizens of different states, and the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction, and venue is proper in this district, under a forum-selection provision in the Affiliate Agreements (as defined below in ¶ 26) which provides that "[i]n the event of any action or proceeding arising out of or relating to this Agreement, the parties agree that jurisdiction and venue shall *only* be proper in the federal court located in Washington." (Emphasis added).

14.     In addition, this Court has personal jurisdiction under RCW 4.28.180 and .185, and under Fed. R. Civ. P. 4.

15.     In addition, venue in this district is proper under 28 U.S.C. § 1391(b)(2), or in the alternative, § 1391(b)(3).

COMPLAINT - 3

## IV.    FACTS

**A.    Laura Hunter invents Magnetic Eyeliner and builds a fast-growing direct sales business centered on innovative cosmetic products and a network of social media influencers.**

16.    After 25 years working as a photographer and makeup artist, businesswoman Laura Hunter grew frustrated with the options available to her for false eyelashes. She searched in vain for a better, easier alternative.

17.    In or around February 2018, she solved this problem by inventing a proprietary magnetic eyeliner and lash system ("Magnetic Eyeliner"). Armed with this promising invention, Hunter founded LashLiner in March 2018. In June 2019, she founded Tori Belle, named after her two daughters. Since then, Hunter has served as CEO of both companies.

18.    Tori Belle is an innovative direct sales company that markets and sells high-quality cosmetics, including Magnetic Eyeliner. Magnetic Eyeliner not only helps its wearers feel capable and beautiful with a variety of styles and colors, but also lets them wear an equally diverse selection of long-lasting, specially adapted false lashes that attach via a user-friendly, patent-pending, magnetic system. All Tori Belle products are designed with high-quality, sustainably sourced ingredients and are hypoallergenic.

19.    Tori Belle sells these products through a network of affiliates ("Affiliates" or "Influencers") and directly to customers. Tori Belle's sister company, LashLiner, also sells the Magnetic Eyeliner and accompanying lashes under the brand name, The LashLiner System™.

20.    Plaintiffs are proud of their small, but rapidly growing business, as well as the training, compensation, technology, and products that Tori Belle offers its customers and Affiliates. Plaintiffs' business helps an ever-expanding group of Affiliates achieve economic independence and personal fulfillment while elevating Tori Belle's mission statement of striving to be "HIP"—Hopeful, Independent, and Prosperous.

21.    Consistent with their "HIP" mission statement, Plaintiffs' business model lets families and friends bond, interact, and prosper through their own Tori Belle Affiliate businesses.

COMPLAINT - 4

22.     As a result, Plaintiffs' business relies on a tightly knit network of social media Influencers that act as Affiliates (the "Affiliate Network"). In turn, the business also relies on the numerous followers, friends, connections, and casual visitors that interact with Affiliates and view their pages on social media (the "Relevant Community").

23.     In addition to providing a marketing structure for Plaintiffs' business, the Affiliate Network and its ties with the Relevant Community help create, rekindle, and strengthen relationships through the positivity, glamor, and independence that Plaintiffs' products represent.

**B.**     **The relationship between Tori Belle and its Affiliates is one of mutual trust and effort in which both parties must act in good faith to pursue shared goals.**

24.     To become a Tori Belle Affiliate, a person must complete an online sign-up process on Tori Belle's website. As part of this process, the prospective Affiliate checks a box indicating that they have had the opportunity to read and study, and agree to be bound by the terms set forth in, certain contractual documents governing the relationship between Tori Belle and its Affiliates and the conduct of Tori Belle's business.

25.     Upon completing the sign-up process and checking the box to indicate their acceptance, the person receives an email confirming their status as an Affiliate.

26.     On information and belief, LaBaw completed this process when she registered as an Affiliate in June 2019.

27.     At that time, the governing agreement was the "Terms and Conditions of the [T]ori [B]elle Independent Affiliate Agreement (the "Initial Agreement"), as amended during LaBaw's tenure as an Affiliate, and later supplemented by the Policies and Procedures of Tori Belle (together with the Initial Agreement, as amended, the "Affiliate Agreements").[1]

---

[1] LaBaw's acceptance of the Initial Agreement included a provision where she acknowledged and agreed to be bound by any alterations, modifications, or amendments to the Initial Agreement. As such, LaBaw was subject to the Affiliate Agreements notwithstanding that certain of its terms took effect after she executed the Initial Agreement.

COMPLAINT - 5

28.     In the Affiliate Agreements, an Affiliate agrees, among other things, to serve as an independent contractor and promote, solicit orders for, and sell Tori Belle products in accordance with company policies; and to recruit and sponsor other individuals to become Affiliates.

29.     An Affiliate also acknowledges the importance to Tori Belle's business of direct marketing and building customer and Affiliate relationships and the time, cost, and effort Tori Belle has expended to build those relationships. As such, Affiliates agree in the Affiliate Agreements to refrain from doing, among other things, any of the following:

a.     Recruiting or soliciting any Tory Belle Affiliates to another multilevel or network marketing business. This obligation exists not only during one's time as an Affiliate but also for six months following termination of that status.

b.      Promoting any non-Tori Belle products alongside Tori Bell products, or doing so at any Tori Belle-related meetings or events.

c.     Disclosing or using Tori Belle's confidential information—including but not limited to the identities and contact information of customers and Affiliates—to compete with Tori Belle or to attempt to influence an Affiliate or customer to alter their business relationship with Tori Belle.

d.     Soliciting Tori Belle customers for purposes of offering or selling products or services other than Tori Belle's.

e.     Making or publishing disparaging statements about Tori Belle or its owners, directors, officers, employees, or affiliates.

30.     In return for an Affiliate's performance of the Affiliate Agreements, Tori Belle agrees to pay its Affiliates commissions based on their sales, as well as additional bonuses for Affiliates that achieve specified levels of sales, performance, or promotional activity.

31.     As mentioned, Affiliates can also recruit others—often from the Relevant Community—to become Affiliates themselves. The recruiting Affiliate then earns a portion of the proceeds of the recruit's sales and, later, the sales of the recruit's recruits, and so on. Affiliates

COMPLAINT - 6

lower in the chain are called a "downline"; those higher up are the "upline"; and the entire chain is referred to as a "leg" of the business.

32.     As of September 2020, Tori Belle's active Affiliates (i.e., those with sales of $200 or more per month), earn an average $430 in compensation per month. Affiliates who have maintained active status for at least a year saw an average monthly income of approximately $1,600 over the same period.

**C.     LaBaw joins Tori Belle as an Affiliate in June 2019, before resigning ten months later when she is found soliciting Tori Belle Affiliates to join a competing business.**

33.     Defendant Michelle "Shelley" LaBaw is a fashion blogger, social media influencer, and Internet troll.

a.     As relevant to her intent for purposes of Plaintiffs' claims, LaBaw's social media activities illustrate a casual attitude toward the truth and a willingness to embrace debunked conspiracy theories.

b.     *See, e.g.*, Shelley LaBaw, Comment to Forbes, *Kamala Harris Makes History As First Female, Black, Asian American Vice President*, LINKEDIN, https://www.linkedin.com/feed/update/urn:li:activity:6731697186154848256/?commentUrn=urn%3Ali%3Acomment%3A(activity%3A6730890806376325120%2C6731697125584896000) (last visited Nov. 19, 2020, 9:27 am CT) ("Eh, idk if cheating counts as breaking glass ceilings. But whatever[.]").

c.     *See also* Shelley LaBaw (@beyoutvindustry), INSTAGRAM, http://instagram.com/beyoutvindustry (last visited Nov. 19, 2020) ("#savethechildren …#qanon #wwgw1wga").

34.     LaBaw signed up as a Tori Belle Affiliate in or around June 2019. In doing so, LaBaw confirmed her acceptance of, and agreement to comply with, the Affiliate Agreements.

35.     In or around March 2020, after she had worked as an affiliate for approximately 10 months, Tori Belle learned that LaBaw was soliciting Tori Belle Affiliates to join another

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

multilevel network marketing company. LaBaw resigned as a Tori Belle affiliate around the same time.

36.     Almost immediately after her resignation, LaBaw launched a campaign of harassment and disinformation intended to humiliate Plaintiffs and harm their business by publishing and disseminating numerous false and misleading social media posts.

**D.    LaBaw publishes, solicits, and shares numerous false and misleading social media posts intentionally orchestrated to harm Plaintiffs' business and falsely portray Plaintiffs as unethical, corrupt, criminals.**

37.     As set forth above, much of Plaintiffs' marketing and sales efforts occur on social media platforms, and on Instagram in particular. Instagram lets users create a profile where they post photos and videos. Instagram users can "follow" each other and interact with their profile posts, for example, by "liking" or commenting on them.

38.     Users can also stream live video using a smartphone or webcam. This has been a particularly important aspect of Plaintiffs' business during the COVID-19 pandemic during which virtual interactions have replaced large in-person events.

39.     In or around mid-2020, LaBaw created the Instagram account under the name "Karen Cunter" with the screenname "@touringhell."

40.     LaBaw chose "Touring Hell" because it loosely rhymes with, and conjures similar sounds as, "Tori Belle."

41.     Likewise, the "Karen Cunter" name was as a bullying nickname LaBaw has used for Plaintiff Laura Hunter. "Karen" is a pejorative term for someone, usually a white woman, who acts in an ignorant, entitled manner and may hold racist, anti-science, or anti-intellectual views.[2] "Cunter" rhymes with "Hunter" and is a variation on a vulgar term that requires no further elaboration. On information and belief, the Relevant Community understood these terms

---

[2] *See, e.g.*, Henry Goldblatt, *A Brief History of 'Karen,'* NEW YORK TIMES (Aug. 3, 2020), https://www.nytimes.com/2020/07/31/style/karen-name-meme-history.html.

COMPLAINT - 8

separately and together to have the respective meanings described above, and understood "Karen Cunter" as a bullying reference to Laura Hunter.

42.     As of December 9, 2020, @touringhell has nearly 666 followers. On information and belief, many if not all of these followers are part of the Relevant Community, and some of them are even current or former Tori Belle Affiliates and customers. On information and belief, some of them are part of LaBaw's former downline from when she herself was a Tori Belle Affiliate.

43.     LaBaw used the "Karen Cunter @touringhell" account and another Instagram account, "@beyoutvindustry," to publish a storm of false, misleading, and disparaging information targeting Plaintiffs.

44.     LaBaw also broadcast livestream videos where she publicly bullied Hunter, and disparaged Plaintiffs before a live virtual audience of dozens.

45.     LaBaw also used @touringhell, and on information and belief, other social media profiles previously used for her Tori Belle business, to promote, market, and, on information and belief, sell non-Tori Belle products.

46.     On information and belief, LaBaw also solicited sales from people in the Relevant Community to whom she had previously sold products when LaBaw herself was an Affiliate. On information and belief, she also recruited people in Tori Belle's Affiliate Network to leave the Affiliate Network and to affiliate with competing businesses.

**1.     LaBaw falsely accuses Plaintiffs of engaging in deceptive business practices.**

47.     LaBaw repeatedly posted a manufactured narrative that Tori Belle engages in fraudulent or misleading business practices. In particular, LaBaw published a series of false and misleading statements, all of which the Relevant Community understood as statements of fact about Plaintiffs' business practices.

48.     LaBaw authored a post on @touringhell's page asking, "Do you wonder why #InfinityPay never happened? And was promised and then taken away? Where did all that money go!? #MagneticEyeliner." These posts were meant, and were understood in the Relevant

COMPLAINT - 9

1   Community, to insinuate that Tori Belle had falsely promised lucrative compensation rewards to

2   leading Affiliates, but instead welched on this promise and kept the money for itself.

3       49.     This innuendo was false: In truth, the concept of an "Infinity Bonus," was

4   something that Tori Belle had discussed internally before its launch, but had never promised or

5   announced. Moreover, neither Tori Belle nor its management had ever defined exactly what an

6   "infinity" bonus might be other than a way to potentially reward exceptional Affiliates who

7   attained certain high levels of performance which, to date, no one at the company has attained. In

8   short, Tori Belle has never offered or promised "infinity" bonuses at all and has never discussed

9   them other than in aspirational terms.

10      50.     LaBaw also stated falsely that Tori Belle deceptively leads Affiliates to expect

11  compensation levels that they have little chance of earning, writing in a @touringhell post that

12  "[a]ccording to this Income Disclosure [sic] statement shared by [Instagram user]

13  HairStylistBrooke, 65% of [A]ffiliates made $0."



K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

51.   This was materially misleading; as the income disclosure statement itself made clear, the 65% figure comprises the "percentage of Affiliates [who] sign up **in order to receive discounts** on products and **do not take part in customer sales**. ... [T]hese [A]ffiliates are **not considered active**." (Emphasis added). Yet LaBaw elided this important qualification.[3]

52.   LaBaw also accused Tori Belle of committing credit card fraud, stealing money from its Affiliates, and continuing to charge them a $9 monthly fee even after an Affiliate resigns. Based on this falsehood and others, which LaBaw and the Doe Defendants published, re-published, and encouraged in various social media comment threads, LaBaw solicited followers to file baseless complaints with the Better Business Bureau ("BBB") and the Washington State Attorney General.

53.   These statements were false: First, the Affiliate Agreements expressly state that a resigning affiliate will not be refunded the monthly fee if the resignation occurs after the fee is charged for that particular month. Second, as Tori Belle explained in response to a misguided BBB complaint, "Per our policies, the [A]ffiliate must make the request to cancel **from the email address we have on file**.  This is for privacy and safety issues of our [A]ffiliates. There are 3 requests from customer service reps informing [the particular complainant] of this and offering assistance once the request comes from the matching email." (Emphasis added).

**2.   LaBaw falsely proclaims that that Plaintiffs' products are harmful, that they are not "patent pending" and that Hunter never invented Magnetic Eyeliner at all.**

54.   Another favorite topic of LaBaw's was disparaging Plaintiffs' products. According to LaBaw, Plaintiffs "misled" their Affiliates and customers by claiming to have "patent pending" products when, in fact Laura Hunter had invented nothing and had stolen the idea or technology from a competitor. All of this was false.

55.   "WHERE ARE THOSE PANTENTS [sic]?" LaBaw ranted in one post. LaBaw stated that the patent for Magnetic Eyeliner had in fact been issued to another company called

---

[3] Perhaps unsurprisingly, the @hairstylistbrooke Instagram account that purportedly shared the original document has since been deactivated.

COMPLAINT - 11

1    Thamel, and as such, Tori Belle's products were not patent pending. This was false. In fact, Thamel

2    is a Chinese brand that itself may be infringing Plaintiffs' intellectual property.

3        56.    LaBaw also claimed falsely that Plaintiffs' products were not "patent pending"

4    because any patent applications had already been rejected.

5            a.    As evidence, LaBaw posted videos and screenshots of the online docket

6    from the U.S. Patent and Trademark Office ("USPTO") website purporting to show "final

7    rejections" of Plaintiffs' patent applications.

8            b.    On information and belief, LaBaw intended for the Relevant Community to

9    understand, and the Relevant Community did understand, these public social media posts to mean

10   that Plaintiffs had failed to obtain a patent and never would be able to do so.

11           c.    In truth, a "final rejection" is an administrative event from which an appeal

12   may be taken with respect to a patent application. Plaintiffs timely filed a notice of appeal with the

13   USPTO in each instance, and as such, their patents are indeed "pending."[4]

14           d.    This was readily apparent from the public USPTO docket when LaBaw

15   posted this misleading information, but she purposefully omitted it.

16       57.    LaBaw also posted a misleading timeline of events to suggest that Plaintiffs stole

17   the Magnetic Eyeliner from a company called "Moxie" that supposedly began selling magnetic

18   eyelashes and eyeliner in 2017 and 2018. She likewise proclaimed in a live video that

19   "Moxielashes was selling lashes six months before Ballbag [another epithet for Laura Hunter]

20   claimed to have invented them."

21       58.    In addition to falsely stating that Hunter had stolen her invention from a competitor,

22   LaBaw promoted the contradictory (but equally false) narrative that Plaintiffs are fraudulently

23

24   _____

25   [4] *See, e.g.*, *Patent Pending*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The designation given
     to an invention while the Patent and Trademark Office is processing the patent application. The

26   phrase warns others that a patent may issue and that if it does, copiers might become infringers.");
     *Pending*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/pending ("[N]ot yet
     decided : being in continuance // the case is still *pending*").

COMPLAINT - 12

1  passing off regular, drugstore eyeliner as an innovative product. In the live video mentioned above,

2  LaBaw said, among other things, the following about Magnetic Eyeliner and Laura Hunter:

3        a.     "It has the same ingredients as regular black eyeliner."

4        b.     "This bitch be scamming people."

5        c.     Hunter is "the biggest freaking liar in the world," a "pathological liar," and

6  a "narcissistic shitbag" with "deranged moral aptitude" who "pretended to invent" Magnetic

7  Eyeliner and was now "passing off a normal, everyday product as a brand new invention."

8        d.     "This is fraud! I hope she gets what she deserves."

9        e.     "Why would somebody build a company on lies?"

10        f.     Plaintiffs' products caused burns, swelling, and blistering on people's

11  eyelids.

12      59.    LaBaw also published dozens of posts to the @touringhell account urging people

13  not to buy Plaintiffs' products because "all black eyeliner is magnetic." She claimed repeatedly

14  that this conclusion was based on "science" and a "science experiment" and that anyone who said

15  otherwise should not be believed.



K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

60.     This was false. In fact, LaBaw's assertion was not backed by any science at all: LaBaw had merely painted black eyeliner on her hand and stuck false lashes there for a few seconds at a time. In fact, Magnetic Eyeliner does not have the same ingredients as drugstore eyeliner, which generally is not hypoallergenic or sustainably sourced and lacks the true magnetic properties of Plaintiffs' Magnetic Eyeliner.

**3.     LaBaw accuses Plaintiffs of criminal activity.**

61.     In addition to claiming that Tori Belle was scamming its customers and stealing from its affiliates, LaBaw accused Plaintiffs of engaging in conduct amounting to wire fraud and money laundering.

62.     On August 24, 2020, the charity group, National Organization For Women's Safety Awareness ("NOWSA"), authored the following post on its Instagram account:



63.     In response, LaBaw wrote on @touringhell that the fundraiser was, in reality, a fraudulent scheme: "Can anyone #ShowMeTheMoney? I'm not sure where it went. But allegedly

COMPLAINT - 14

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

it's now all in the Bahamas. 🌴 See anonymous … swipe right." Accompanying this post was an image suggesting that NOWSA is a sham organization that helped Hunter hide the money offshore.



64.     This was false. In fact, the proceeds of the Tori Belle Pays It Forward fundraiser were indeed donated to the NOWSA, which is indeed a registered 501(c)(3) tax exempt organization with the IRS, EIN number 26-1234277. The allegations regarding moving these monies to the Bahamas appear to be completely fabricated with no basis in reality of which Plaintiffs have any knowledge, information, or belief.

**4.      LaBaw solicits people to file complaints with regulatory and law enforcement agencies and attempts to organize boycotts of Plaintiffs' business.**

65.     Having created a fog of misleading statements and false narratives, LaBaw authored and published social media posts encouraging visitors to file complaints with the Federal Trade Commission, the Washington State Attorney General's Office, and the BBB.

66.     As a result of LaBaw's conduct, Tori Belle received a number of complaints, many of them either baseless or premised on the complainant's seemingly deliberate misunderstanding of Tori Belle's policies. Plaintiffs had to devote countless person-hours to addressing these issues, many of which, as mentioned, were essentially nuisance or gadfly-type complaints. In addition to

COMPLAINT - 15

the wasted time, Plaintiffs incurred significant costs related to compliance and customer support staff to address baseless and unfounded complaints.

67.     Likewise, LaBaw solicited people to boycott Tori Belle, inviting her followers to "block" a litany of Instagram accounts associated with Tori Belle and Tori Belle Affiliates. Blocking an account would prevent the blocked account from interacting with or viewing the profile of the person who blocked it. Doing this would essentially cut Tori Belle and its Affiliates off from members of the Relevant Community on which Plaintiffs' business, not to mention important personal relationships, relied.

68.     In a September 10, 2020 post, LaBaw hinted at an imminent departure from Tori Belle of 30,000 people. Although this never occurred, it illustrates both LaBaw's casual relationship with the truth and her desire to promote the false narrative of Plaintiffs' business as so corrupt that people are leaving in droves.

**5.     LaBaw targets Hunter, specifically, with an unending stream of vicious personal attacks, lies, and bullying behavior.**

69.     Not content to go after Plaintiffs' business alone, LaBaw also targeted Hunter, personally, for cruel attacks meant to harass, intimidate, humiliate, and, ultimately, destroy her by painting Hunter as a drunk and dishonest sociopath.

70.     In at least one post, LaBaw assumed the "Karen Cunter" identity and, writing in the first person, impersonated Hunter to paint her as vapid and classless, as well as to make clear to people in the Relevant Community that Plaintiffs were the subject of the false, misleading, and defamatory statements published on the "Karen Cunter @touringhell" account.

COMPLAINT - 16

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022



71.     LaBaw repeatedly labeled Hunter a "narcissist," "sociopath," and a "psychopath" in various posts, attributing to her the antisocial personality traits associated with those conditions, such as "pathological lying," "manipulation of others," "lack of empathy," "parasitic lifestyle," "early childhood behavioral problems," and "juvenile delinquency."

72.     In another instance, LaBaw wrote that "Laura [Hunter] accidentally wore hers [false lashes] to Walmart once. They probably thought she was a hooker out of lube!"

73.     LaBaw also attributed homophobic quotes and beliefs to Hunter: She captioned a post of a young woman wearing rainbow makeup with the false allegation that Hunter had once joined a Facebook Live stream and told the streamer, "good luck, no one will follow you because you're gay."  Hunter's homophobic beliefs, wrote LaBaw, were also the reason that Hunter put a rainbow, painted in frosting, on a cake. This cake bore the frosting inscription "you're dead to us; we hope you fail" and, according (inaccurately) to LaBaw, Hunter used it to intimidate anyone considering leaving the company.

74.     But by far LaBaw's most hurtful, outrageous, and offensive bullying occurred in her in livestreamed video monologues, in which she said, among other things, the following about Hunter:

COMPLAINT - 17

     a.     "We need to name everyone. … Everyone's got codename's here. … [W]e'll call her 'Ballbag.' I just think of her as a scrotum. She's the CEO of Touring Hell."

     b.     "She's made out of scrotum tissue. … She is a nut sack. She is a nutter butter. She is a crazy person. She's narcissistic. She's a psycho."

     c.     "**I hate this woman**. She's a psychopath."

     d.     "[A] fucking moron."

     e.     "[A] dirty cunt."

     f.     "**She's a dirty ass ball bag with smegma all over her**."

     g.     "I take no pleasure in **being right** that she's a psychopath."

     h.     **Upon realizing that Hunter had joined the broadcast stream: "Ballbag is watching. Everyone say 'hi' to Ballbag!"**

     i.     "**This company deserves to burn to the ground**."

     j.     "**I want things to work out and in my head the only way I see that happening is if the owner [of Tori Belle] gets run over by a tractor trailer** …."

     k.     Speaking wishfully of the possibility that Hunter "could choke on a lipstick, she could poison herself with something from China" and die.

75.     In her video tirades, LaBaw also frequently accused Hunter, falsely, of problematic daytime drinking. LaBaw falsely told her viewers that:

     a.     "My team should not be subjected to her [Hunter's] day drinking."

     b.     "She was day drinking. She must have been day drinking."

     c.     "Maybe she was blacked out, I don't really know."

     d.     "Sunday afternoon. Just day drinking… Ballbag must have been deep in it!"

76.     On information and belief, dozens of people, including members of the Relevant Community, viewed these live online video broadcasts.

77.     LaBaw intended to inflict extreme distress and humiliation on Hunter.

78.     She succeeded.

COMPLAINT - 18

79.     Put simply, the entire @touringhell Instagram account is not just a means by which LaBaw engaged in cyberbullying and tortious acts. It is also a shrine to LaBaw's hatred toward Plaintiffs, her desire to inflict not just economic harm, but also humiliation, scorn, and contempt, and the lengths to which she will go to do so.

80.     Plaintiffs allege that, on information and belief, LaBaw has since deleted or removed many of the offending statements described in this Complaint; or, in the alternative, on information and belief, that Instagram did so due to LaBaw's violating its Community Guidelines or terms of service.

81.     In addition, in or around late November or early December 2020, the @touringhell account was set to "private," meaning that only its followers can view the content published on he page. Additional people, however, including Members of the Relevant Community, can still view and interact with the account if they send a "follow" request and are approved by LaBaw.

82.     Despite having been set to "private," on information and belief, LaBaw's tortious activities continue and many members of the Relevant Community can and do still view and access her publications, which are ongoing.

83.     As a result of LaBaw's and the Doe Defendants' conduct as described above, Plaintiffs have suffered damages in an amount that far exceeds $75,000. For example but without limitation:

        a.      LaBaw's disinformation campaign has increased attrition among Tori Belle's active Affiliates (those with monthly sales exceeding $200) and has depressed new-Affiliate sign-up rates, resulting in what Plaintiffs estimate to be hundreds of thousands of dollars in lost sales revenue each month.

        b.      Plaintiffs also estimate that at least $100,000 worth of person hours have been wasted as a result of having to address the consequences of LaBaw's conduct, including the filing of baseless or unwarranted consumer complaints.

        c.      LaBaw's actions also effectively destroyed her own downline and sales team, resulting in annual lost sales revenue of more than $1,000,000.

COMPLAINT - 19

d.      Plaintiffs believe these rough estimates are conservative and will find additional support through the discovery process.

## V.      CAUSES OF ACTION

### Count I – Defamation
(On behalf of all Plaintiffs)

84.      Plaintiffs incorporate by reference as if expressly set forth in this paragraph the preceding factual allegations in Parts I–IV.D.5 of this Complaint.

85.      As detailed above, LaBaw published numerous false and defamatory statements about Plaintiffs.

86.      These communications are defamatory per se in that they exposed Plaintiffs to hatred, contempt, ridicule, accused them of criminal activity, deprived them of public confidence, or injured them in their business, trade, profession, or office.

87.      These communications are not privileged in any way.

88.      LaBaw is at fault for publishing these statements.

89.      As a proximate result of this conduct, Plaintiffs suffered damages, including, but not limited to, reputational, financial, professional, and emotional harms, in an amount to be proven at trial.

### Count II – Trade Libel/Product Disparagement
(On behalf of LashLiner and Tori Belle)

90.      Plaintiffs incorporate by reference as if expressly set forth in this paragraph the preceding factual allegations in Parts I–IV.D.5 of this Complaint.

91.      LaBaw knowingly published false statements about LashLiner's and Tori Belle's products as described above.

92.      These statements were harmful to LashLiner's and Tori Belle's interests.

93.      LaBaw intended such publication to harm LashLiner's and Tori Belle's pecuniary interests.

COMPLAINT - 20

94.    As a proximate result of this conduct, LashLiner and Tori Belle suffered damages in an amount to be proven at trial.

### Count III - Tortious Interference with Contract or Business Expectancy
(On behalf of LashLiner and Tori Belle)

95.    Plaintiffs incorporate by reference as if expressly set forth in this paragraph the preceding factual allegations in Parts I–IV.D.5 of this Complaint.

96.    Tori Belle was and is a party to contracts with various Affiliates as well as contracts for sale with various customers.

97.    Tori Belle and LashLiner prospectively expected economic benefit flowing from anticipated recruitment of additional Affiliates and additional sales to customers and affiliates.

98.    LaBaw was aware of the contracts and prospective economic benefits mentioned above.

99.    Through her acts described above, LaBaw intentionally interfered with these contracts and business expectancies.

100.    LaBaw's interference was motivated by an improper purpose, namely spite, hatred, and the desire to do harm for its own sake. The interference also involved improper means in that it was accomplished through, among other things, false and misleading statements, independent contractual violations by LaBaw, and through soliciting boycotts, regulatory complaints, and refusals to deal with LashLiner or Tori Belle.

101.    As a factual and proximate result, Lashliner and Tori Belle suffered damages in an amount to be proven at trial.

### Count IV - Breach of Contract
(On behalf of Tori Belle)

102.    Plaintiffs incorporate by reference as if expressly set forth in this paragraph the preceding factual allegations in Parts I–IV.D.5 of this Complaint.

103.    LaBaw and Tori Belle were both parties to the Affiliate Agreements which form a valid and enforceable contract, as amended.

COMPLAINT - 21

104.     This contract required LaBaw, among other things, to perform duties of confidentiality, noncompetition, non-solicitation, and non-disparagement with respect to Tori Belle and its products and personnel.

105.     All conditions precedent to LaBaw's performance had been satisfied or waived.

106.     Through the conduct described above, LaBaw breached these contractual duties.

107.     As a factual and proximate result, Tori Belle suffered damages in an amount to be proven at trial.

### Count V - False Light
(On behalf of Hunter)

108.     Plaintiffs incorporate by reference as if expressly set forth in this paragraph the preceding factual allegations in Parts I–IV.D.5 of this Complaint.

109.     By doing the acts described above, LaBaw publicized a matter that placed Hunter in a false light that would be highly offensive to a reasonable person and was highly offensive to Hunter.

110.     LaBaw knew her conduct would have this effect, or she recklessly disregarded the risk that it would.

111.     As a direct and proximate result, Hunter suffered damages in an amount to be proven at trial.

### Count VI - Outrage/Intentional Infliction of Emotional Distress
(On behalf of Hunter)

112.     Plaintiffs incorporate by reference as if expressly set forth in this paragraph the preceding factual allegations in Parts I–IV.D.5 of this Complaint.

113.     As detailed above, LaBaw has repeatedly engaged in extreme or outrageous conduct. Her conduct goes beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

114.     This conduct would be highly offensive to a reasonable person.

115.     Hunter was the recipient of the extreme or outrageous conduct.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

116.    This conduct caused severe emotional distress and other damages to Hunter.

117.    LaBaw intentionally or recklessly engaged in this conduct and caused these damages.

## VI.    REQUEST FOR RELIEF

Plaintiffs respectfully asks this Court to grant the following relief:

A.      Injunctive relief requiring LaBaw to remove the existing false and defamatory communications and barring the publication of any further such communications.

B.      Judgment in favor of Plaintiffs for damages in an amount to be proven at trial, in an amount that exceeds $75,000.00.

C.      An award of attorneys' fees under any agreement, statute, or rule authorizing such an award.

D.      Such other and further relief as this Court deems just and equitable.


DATED December 9, 2020.


K&L GATES LLP

By s/Peter A. Talevich
Peter A. Talevich, WSBA # 42644


By s/ Daniel-Charles V. Wolf
Daniel-Charles V. Wolf, WSBA # 48211

925 Fourth Ave., Suite 2900
Seattle, WA  98104-1158
Phone: (206) 623-7580
peter.talevich@klgates.com
dc.wolf@klgates.com

Desiree F. Moore, (to seek pro hac vice admission)
70 West Madison Street, Suite 3300
Chicago, Illinois 60602
Phone:  (312) 372-1121
desiree.moore@klgates.com


Attorneys for Plaintiffs

COMPLAINT - 23